# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NEW FORTRESS ENERGY INC. SECURITIES LITIGATION | **Case No. 1:24-cv-07032-JGK** <br><br> **CLASS ACTION** <br><br> Honorable John G. Koeltl |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, N.Y. 10004
(212) 363-7500
(212) 363-7171 (fax)

*Attorneys for Lead Plaintiff
and Lead Counsel for the Class*

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II. STATEMENT OF FACTS ....................................................................................3

A.  FLNG-1 Was Critical to NFE's Operations..........................................3

B.  Defendants Begin to Mislead Investors in 2022 While Simultaneously Announcing a Massive Dividend That Delivers a Windfall to Edens..........................................3

C.  Defendants Ship FLNG-1 Offshore Before Construction is Complete, But Tell Investors the Opposite................................................................4

D.  Defendants Continued to Misrepresent FLNG-1's Status Despite More Problems 4

E.  The Truth is Revealed Through a Series of Partial Disclosures ............................5

III. LEGAL STANDARD............................................................................................5

IV. ARGUMENT.........................................................................................................7

A.  The Complaint Pleads a Reasonable Inference of Falsity ......................................7

    1.  Defendants Misled Investors Concerning the Status of FLNG-1's Construction and NFE's Operations and Financial Condition ..................7

    2.  Defendants' Misrepresentations Are Unprotected by the Safe Harbor .....12

    3.  Defendants Are Liable Even If Opinions Were Expressed ......................14

    4.  Defendants' Misrepresentations Went Well Beyond Corporate Optimism...............................................................................................15

B.  A Strong Inference of Scienter is Alleged .............................................................16

    1.  Actual Knowledge of Facts That Rendered Defendants' Statements Misleading..............................................................................................16

    2.  FLNG-1 Was NFE's Core Operation ........................................................18

    3.  Motive, Though Not Required, is Alleged.................................................19

    4.  Defendants Present No Competing Inference............................................20

C.  The Complaint Sufficiently Alleges Loss Causation.............................................20

D.  The Complaint Adequately Alleges Violations of §20(a) of the Exchange Act....21

V.  CONCLUSION....................................................................................................21

CERTIFICATE OF COMPLIANCE......................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abramson v. NewLink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)........................................................................16

*BG Litig. Recovery I, LLC v. Barrick Gold Corp.*,
    180 F. Supp. 3d 316 (S.D.N.Y. 2016) .......................................................18

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (D. Conn. 2021) .......................................................20

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020).........................................................7

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008).......................................................14

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015).................................................................6, 17

*Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................................14

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ...............................................................7, 11

*In re Akorn Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) .......................................................13

*In re Avon Sec. Litig.*,
    No. 19 Civ. 01420 (CM), 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) .....18, 19

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
    No. 1:22-cv-03925-LGS, 2025 U.S. Dist. LEXIS 61068 (S.D.N.Y. Mar. 31, 2025)...............11

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17 Civ. 1580 (LGS), 2018 U.S. Dist. LEXIS 87991 (S.D.N.Y. May 24, 2018) ..............18

*In re Estée Lauder Co., Inc. Sec. Litig.*,
    No. 23-cv-10669 (AS), 2025 U.S. Dist. LEXIS 61337 (S.D.N.Y. Mar. 31, 2025)............20, 21

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017).......................................................14

*In re New Century,*
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................................19

*In re OSG Sec. Litig.,*
    12 F. Supp. 3d 622 (S.D.N.Y. 2014) .......................................................................13

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) .......................................................................................16

*In re Signet Jewelers Ltd. Sec. Litig.,*
    No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018) .............16

*In re Silvercorp Metals Sec. Litig.,*
    26 F. Supp. 3d 266 (S.D.N.Y. 2014) .........................................................................7

*In re Synchrony Fin. Sec. Litig.,*
    988 F.3d 157 (2d Cir. 2021) .............................................................................7, 8, 17

*In re Tufin Software Techs. Ltd. Sec. Litig.,*
    No. 1:20-cv-5646-GHW, 2022 U.S. Dist. LEXIS 34053 (S.D.N.Y. Feb. 25, 2022)...............11

*In re Turquoise Hill Res. Ltd. Sec. Litig.,*
    625 F. Supp. 3d 164 (S.D.N.Y. 2022) ...................................................................15, 17

*In re VimpelCom, Ltd.,*
    No. 1:15-cv-8672 (ALC), 2016 U.S. Dist. LEXIS 135050 (S.D.N.Y. Sep. 26, 2016) ...........21

*In re Vivendi, S.A. Sec. Litig.,*
    838 F.3d 223 (2d Cir. 2016) .................................................................................6, 12

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.,*
    620 F.3d 137 (2d Cir. 2010) .....................................................................................13

*Jaeger v. Zillow Grp., Inc.,*
    644 F. Supp. 3d 857 (W.D. Wash. 2022) ..................................................................12

*Lau v. Opera Ltd.,*
    527 F. Supp. 3d 537 (S.D.N.Y. 2021).......................................................................18

*Lea v. TAL Educ. Grp.,*
    837 F. App'x 20 (2d Cir. 2020) ..................................................................................6

*Liberty Media Corp., LMC v. Vivendi Universal, S.A.,*
    923 F. Supp. 2d 511 (S.D.N.Y. 2013) ......................................................................21

*Lozada v. TaskUs, Inc.*,
    710 F. Supp. 3d 283 (S.D.N.Y. 2024) ...........................................................17, 18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...................................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...................................................................................5

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)...............................................................13, 14

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020).....................................................17

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ..............................................................7

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013).....................................................................7

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................6, 7

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
    58 F.4th 195 (5th Cir. 2023) ..............................................................13, 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).................................................................................15

*San Antonio Fire & Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024) ...................................................21

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)......................................................................6

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018).....................................................16

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015).......................................................7

*Smith v. PureCycle Techs., Inc.*,
    No. 23-cv-8605 (JGK), 2024 U.S. Dist. LEXIS 232013 (S.D.N.Y. Dec. 20, 2024) ...............14

*Speakes v. Taro Pharm. Indus.*,
    No. 16-cv-08318 (ALC), 2018 U.S. Dist. LEXIS 163281 (S.D.N.Y. Sep. 24, 2018) ............11

*Stadium Capital LLC v. Co-Diagnostics, Inc.*,
    No. 22-cv-6978 (AS), 2024 U.S. Dist. LEXIS 19754 (S.D.N.Y. Feb. 5, 2024)......................19

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014)......................................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................................5, 6

**Statutes and Rules**

Section 10(b) of the Securities Exchange Act of 1934 .............................................................5, 21

Lead Plaintiff Jack DeCicco together with additional named plaintiff Ian Luzin (collectively, "Plaintiffs") respectfully submit this opposition to the motion to dismiss filed by Defendants New Fortress Energy, Inc. ("NFE" or the "Company"), Wesley Robert Edens ("Edens") and Christopher S. Guinta ("Guinta") (collectively, "Defendants").

## I.     INTRODUCTION

For nearly two years, Defendants misled investors concerning the timing and construction of a floating liquified natural gas facility (hereafter "FLNG-1") meant to operate in the Gulf of Mexico. Completion and production dates were routinely revised as delays compounded, but Defendants consistently made false, positive statements concealing the true state of affairs.  At the beginning of the Class Period, Defendants held an Investor Day to set the stage for a meteoric rise in earnings propelled by FLNG-1, but a Former Employee ("FE") confirms that this was merely a ruse intended to deceive investors by creating an illusion of progress that did not exist.  FLNG-1 was not nearly as developed as portrayed to analysts who attended the event.  When the time came to deploy FLNG-1 offshore, the rig was still critically behind schedule with integral mechanical components still uninstalled despite Defendants' statements that it was "mechanically completed."  Nearly half a dozen FEs confirm that Defendants shipped FLNG-1 offshore before it was properly constructed, which led to more delays as offshore conditions made it even more difficult to complete the project. Defendants, however, maintained the lie and told investors that FLNG-1 was completed, that production would begin within days, and that the earnings figures given to investors at the start of the Class Period were still valid.

There can be no doubt that Edens and Guinta, NFE's CEO and CFO respectively, knew about the construction crisis that had taken over FLNG-1.  They acknowledged that FLNG-1 was critical to the Company's success, and both held themselves out as extremely knowledgeable about the unit, regularly providing investors with details about its status.  Moreover, Edens received updates about

1

FLNG-1's lagging progress and breathtaking setbacks in real time (such as the explosion that occurred in the rig's "cold box" component due to it not having been tested under proper circumstances before being shipped offshore) via a WhatsApp chat group with NFE's Commissioning and Startup Manager for FLNG-1 and other key employees.  Guinta, meanwhile, repeatedly postponed commencing service contracts because of uncertainty concerning when FLNG-1 could become operational.  These are only examples indicative of their scienter.  The Complaint pleads a lot more.

Faced with well-pleaded allegations, Defendants attempt to engage in factual disputes impermissible at this stage to hypothesize that FLNG-1 was "successfully built" in late 2024 (a new, descriptive term that appears nowhere in any of NFE's press releases or SEC filings).  Defs.' Mem. Supp. Mot. to Dismiss ("Mem.") (ECF No. 40) at 1.  But this innocence-by-hindsight defense does nothing for already-damaged shareholders, who relied on Defendants' Class Period misrepresentations and suffered losses.  Defendants' assumption that FLNG-1 ultimately became "success[ful]" cannot be credited at this stage, and is contradicted by FE accounts that material aspects of the unit remained incomplete in the same month when the last misrepresentation was made.  The argument also disregards the realities of the cost overruns and revenue shortfalls caused by the delays; thus, even if FLNG-1 was at some point completed after the Class Period ended, the value and profits it was supposed to create for Class Period investors have never materialized.  In fact, NFE's stock presently trades near its all-time low as it struggles to service massive amounts of debt and timely file its quarterly reports with the SEC.  Far from propelling NFE to the forefront of the LNG industry, the FLNG-1 debacle has left NFE a shell of what it once was with "substantial doubts" about its ability to remain a going concern.

For these reasons, Plaintiffs respectfully request the Court to deny Defendants' motion to dismiss.

## II.    STATEMENT OF FACTS

### A.    FLNG-1 Was Critical to NFE's Operations

Before the Class Period, Edens promoted FLNG-1 as *the* key driver of NFE's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), designed to propel EBITDA from breakeven to "$2.5 billion plus" in just a few years. ¶¶54, 56, 57.[1]  In December 2022, Edens admitted that even a short delay of one to three months would severely impact the Company.  ¶¶191-93.  FLNG-1 was so important to NFE's success that Edens and Guinta held daily calls concerning the project, and Edens kept track of the project's progress (with daily and sometimes hourly updates) through a WhatsApp chat group with supervisors onsite at FLNG-1.  ¶¶197-99.

### B.    Defendants Begin to Mislead Investors in 2022 While Simultaneously Announcing a Massive Dividend That Delivers a Windfall to Edens

At the beginning of the Class Period, Defendants repeatedly told investors that FLNG-1 would achieve "mechanical completion" in March 2023 and deploy into operation by mid-year.  ¶¶60, 109, 112.  An Investor Day was held on November 2, 2022 simultaneously with an announced increase in EBITDA based on FLNG-1 becoming operational by mid-2023.  ¶¶60, 109, 114.  FE12 states that the Investor Day was staged to give an illusion of progress, so much so that NFE shifted the main turbines from Siemens AG's ("Siemens") factory three months before they were complete and a project engineer led attendees on tour of the site that exaggerated development.  ¶75.  FE12 further explained that Siemens had agreed to finish constructing the main turbines in Corpus Christi after the FLNG Investor Day.  ¶75.

---

[1] ¶__  ¶¶___ citations are to the Amended Complaint filed at ECF No. 33.  All internal citations and quotation marks are omitted, and all emphasis is supplied unless stated otherwise.

On December 13, 2022, NFE announced a $3 per share dividend, far more than any dividend paid before or after, which Defendants stated reflected the strength in the day-to-day business and was not "forward-looking." ¶¶5, 121. Edens personally received $217 million in cash or around 35% of the overall distribution. ¶¶5, 212.

### C.    Defendants Ship FLNG-1 Offshore Before Construction is Complete, But Tell Investors the Opposite

By July 2023, FEs confirmed with specific accounts that Defendants shipped the unfinished, incomplete FLNG-1 offshore from Corpus Christi because of mounting costs, which became a pivotal reason for persistent delays. ¶¶79, 81, 84, 86-91. For instance, according to FE10, everyone working on FLNG-1 knew it was incomplete when it was sent offshore. ¶81. FE1 explains that NFE skipped a needed "nitrogen run" test to avoid missing deadlines. ¶83. Additionally, a critical piece of rig equipment that kept FLNG-1 afloat, the marine scope, was incomplete. ¶¶89-90. In mid-2023, Fluor Corporation left the project, which resulted in the loss of vital commissioning workers. ¶85. Known product shortages also delayed construction throughout the summer of 2023, as did hurdles bringing older equipment like the rigs themselves up to date. ¶88. The FEs' accounts are corroborated by an insurance consortium that sent a warning letter after discovering that critical systems were noncompliant. ¶92.

Instead of disclosing any of these facts, Defendants told investors for months that FLNG-1 was "mechanically" and "materially" complete, and ready to commence commercial operations in the fall of 2023. ¶¶146, 149, 152, 153, 155. Guinta told investors that there was "very little volatility" and "very little [] risk" in the $2 billion EBITDA target upon which completion of FLNG-1 was based. ¶¶134-36. Edens claimed that virtually all of the $2.4 billion figure for 2024 was "already contracted." ¶155.

**D.      Defendants Continued to Misrepresent FLNG-1's Status Despite More Problems**

In January 2024, Guinta instructed FE11 to delay service and repair contracts at FLNG-1 because it was uncertain when operations could begin.  ¶98.  Per FE8, the liquefaction plant had significant piping and system integration work remaining in February 2024.  ¶94.  FE2 who joined the Company in January 2024 says that key aspects of construction and commissioning were incomplete when FE2 arrived at the site.  ¶¶102-04.  For example, FE2 explains that tests revealed rocks, debris, caution tape, and even a radio battery inside pipes because of Defendants' decision not to conduct a nitrogen test.  ¶106.  FE6 and FE12 corroborate FE2's account.  ¶¶99-101.  Nevertheless, on March 25, 2024, Edens told investors that FLNG-1 was "coming online here any day."  ¶162.

On April 26, 2024, an explosion damaged a key component in the LNG refrigeration process, requiring about a month's worth of repairs.  ¶104.  Edens visited FLNG-1 immediately after this explosion, per FE12, and returned twice more later that year.  ¶201.  Instead of disclosing these material facts, on May 8, 2024, Defendants stated that construction was complete, first gas would be delivered in May, and first cargo sold in June 2024.  ¶165.  Edens claimed that FLNG-1 was in the final stages of commissioning, while Guinta minimized the explosion as a small problem that could be managed within days.  ¶167.  In July 2024, the Company announced that FLNG-1 was "operational," but an FE states that commissioning of an important unit did not occur until the end of that month.  ¶¶171-72.

**E.      The Truth is Revealed Through a Series of Partial Disclosures**

The Company's stock price declined materially on each occasion that Defendants disclosed delays in completion dates, revised guidance downwards or lowered NFE's stated EBITDA goals as a result of these delays.  Analysts uniformly reacted negatively to the bad news.  ¶¶173-90.

**III.    LEGAL STANDARD**

At this stage, Plaintiffs "need only allege enough facts to state a claim to relief that is plausible

on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).  The Court accepts all well-pled factual allegations as true and draws all reasonable inferences in Plaintiffs' favor.  *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).  Under Section 10(b) of the Exchange Act, the elements of a securities fraud claim are: (1) a misrepresentation or omission of a material fact, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 22 (2d Cir. 2020).

To plead falsity, a plaintiff is required only to: (1) specify each statement alleged to be misleading, (2) identify the speaker, (3) state where and when the statement was made, and (4) explain why the statement is misleading.  *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).  "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  A plaintiff is not required to plead all facts that may support his or her claim, but only those facts that support a reasonable belief that a defendant made misleading statements.  *See Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000) (explaining standard).

A complaint can adequately plead scienter either based on (1) motive and opportunity to commit fraud *or* (2) strong circumstantial evidence of recklessness.  *Blanford*, 794 F.3d at 306.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences."  *Tellabs*, 551 U.S. at 324.  A complaint survives a motion to dismiss if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*  Courts examine complaints "holistically and consider[] ***all of the facts alleged, taken collectively***, rather than any individual allegation, ***scrutinized in isolation***."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64,

78 (2d Cir. 2021).  Under *Tellabs*, a plaintiff prevails at the pleading stage if both inferences are equally compelling.  551 U.S. at 324.

## IV.    ARGUMENT

### A.    The Complaint Pleads a Reasonable Inference of Falsity

### 1.    Defendants Misled Investors Concerning the Status of FLNG-1's Construction and NFE's Operations and Financial Condition

The Complaint pleads sufficient facts to support a reasonable belief that Defendants made false and misleading statements.  *See Novak*, 216 F.3d at 313-14 (holding that a reasonable belief supported by sufficient facts is enough to plead falsity); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 90 (S.D.N.Y. 2015) (same); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (reversing dismissal and holding that a complaint only needs to plead a reasonable, not a strong, inference of falsity).

FE accounts are credited when they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.  Defendants do not contest that this requirement is met.  FE accounts are assessed pursuant to a "liberal standard."  *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020); *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013) (rejecting claim that FE experiences in specific regions should be viewed with suspicion when the complaint pled a reasonable basis to plead company-wide practices); *In re Silvercorp Metals Sec. Litig.*, 26 F. Supp. 3d 266, 272 (S.D.N.Y. 2014) (FE added force to the allegations even if statements attributed to FE were insufficient standing alone).

The Second Circuit has routinely reversed dismissal when a defendant's representations conflict with the accounts of FEs, who have personal knowledge of the subject matter of the fraud.  *See, e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (crediting

allegations from lower-level employees concerning the volume of obsolete inventory to hold that statements about financial performance were properly pled as false); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) (examining FE accounts related to the deterioration of a relationship with a business partner to hold that statements concerning no pushback from that partner were false). The Complaint surpasses these standards.

At the beginning of the Class Period, Defendants held an Investor Day to tout unrealistic EBITDA figures principally based upon the false claim that deployment of FLNG-1 was on schedule for early 2023, and proved a "repeatable" and "efficient" construction process that reduced time and costs. ¶¶114-15. According to FE12, Defendants created an illusion of progress at this event by prematurely shifting main turbines from a Siemens factory. ¶75. From November 8, 2022 to February 2023, Defendants repeatedly misled investors to believe that FLNG-1 was on schedule and on budget, ¶¶117, 119, 121, 125, and "basically near completion." ¶128. Edens claimed that he had "tremendous visibility" into EBITDA, and the unusually high dividend that was then declared "really just reflects the business." ¶121. On May 4, 2023, NFE claimed that construction of FLNG-1 was "90%+ Complete and Deployment" was expected in June 2023. ¶140. In the same month, Defendants also told investors that NFE was commissioning as much as possible to shorten the timelines further. ¶143. Commissioning is the final testing of an LNG plant before operations, and cannot be done before the main systems are complete. ¶¶68-69.

Multiple FEs confirm that all these statements were false because construction was not substantially complete. FE1 states that, in mid-2023, Fluor Corporation was terminated, causing NFE to lose expert commissioning workers at a critical juncture. ¶85. FE1 further confirms that a standard nitrogen test was skipped, ¶¶83-84, and this shortcut caused problems with debris in pipes and strainers according to FE2, ¶106. FE3 explains that the gear system on one of the jack-up rigs had malfunctioned requiring further repairs, and major piping work was incomplete before the unit was

shipped offshore.  ¶¶86-87.  FE9 states that the marine scope was incomplete in June 2023, and repurposed rigs were not up to date.  ¶90.  These accounts are corroborated by FE10, who alleges that a tracking system called MC Plus showed the status of incomplete projects, which was discussed in weekly meetings.  ¶82.  FE12, the Vice President of Commissioning and Startup during the Class Period, confirms that it was Edens who moved FLNG-1's unit and rigs offshore before construction was complete.  ¶¶80-81.

Despite all of this, starting in August 2023, Defendants repeatedly told investors that FLNG-1 was "mechanically" and "materially complete," and ready to "sell[] First Cargo in October[] 2023." *E.g.*, ¶¶146, 149.  It was not.  FE8 joined the project in November 2023 and immediately noticed that key components were unfinished, and critical safety and compliance systems were not functional. ¶¶37-38, 91.  These kinds of accounts are corroborated by third parties.  According to FE8, the insurance consortium for FLNG-1 similarly found that critical systems were not functional, and sent a warning letter to NFE shortly after the rigs were shipped offshore.  ¶92.  Instead of disclosing these material facts, on November 8, 2023, Edens falsely told investors that FLNG-1 was "firmly in place," "in the final stages of being commissioned," "virtually all of" the $2.4 billion in EBITDA was "already contracted," and Guinta misrepresented that NFE would produce "the first drop of LNG in the next few weeks."  ¶155.

FE12 recounts that, by no later than December 2023, it was well known that FLNG-1 would not be commissioned by March 2024.  ¶99.  In January 2024, Guinta told FE11 to delay service contracts due to uncertainty regarding when operations could commence.  ¶¶98, 206.  At around the same time, FE2 arrived onsite and was shocked to learn that key aspects of the project remained uninstalled.  ¶102.  Despite Defendants' claim that no FE uses the defined term "mechanically complete," Mem. at 14, FE2 affirmatively says that the LNG Boil-Off Gas Compressor and Hot Oil System was not fully installed, tested or "mechanically complete" in January 2024, ¶102.  FE2 also

attributes the repeated shift in Defendants' timelines to the failure to complete pre-commissioning steps onshore.  ¶106.  For example, the failure to conduct a nitrogen test caused rocks and debris to collect inside pipes.  *Id.*  Similarly, FE6, who also joined the Company in January 2024, confirms that the failure to complete construction on time exposed NFE to further storm delays between January 2024 and March 2024.  ¶101.

FE2 further asserts that almost nothing had been commissioned by February 2024, and Defendants' target for First Production was off by several months.  ¶103.  FE12 expounds that major installation work, including insulation and painting, remained ongoing in March 2024.  ¶100.  FE8 similarly recounts that first LNG by April 2024 was impossible because piping and system integration remained incomplete.  ¶94.  Defendants did not disclose these material facts.  Instead, on February 29, 2024, Edens told investors that "we're at the very, very tail end of that project," and Guinta misrepresented that "we're in the final stages of commissioning" with first LNG in March 2024 and first cargo to sale in April 2024.  ¶160.

On April 26, 2024, a cold box used to cool and liquify natural gas exploded during a pressure test.  ¶104.  FE2's account shows the explosion was significant, took over a month of repairs, delayed construction further, forced Defendants to yet again reassess timelines, and occurred because of the decision to skip critical testing onshore.  ¶¶104-05.  On May 8, 2024, however, Guinta minimized the scale of the complication, telling investors that the "damage was isolated" and would be repaired in a matter of days.  ¶167.

In June 2024, NFE did not know when the unit would be operational according to FE11.  ¶98.  Yet, on June 14, 2024, Defendants issued a press release, claiming that "the work necessary to begin operations is complete."  ¶169.  On July 9, 2024, FE2 explains that the scrubs column bottom pump was still leaking, an issue that should have been addressed in the early steps of commissioning had that been done properly.  ¶105.  FE2 also explains that the commissioning of the heavy hydrocarbon

unit did not occur until late July 2024. *Id.* At that same exact time in July 2024, Defendants, however, told investors that FLNG-1 was "now operational." ¶¶171-72.

These particularized allegations and others pled in tedious detail surpass the applicable pleading standards. Defendants barely engage with these specific allegations, and the reasons offered to discredit the FEs have been rejected repeatedly. It is of no moment that some of the FEs are lower-level employees who did not directly report to the Individual Defendants. *See, e.g.*, *In re Tufin Software Techs. Ltd. Sec. Litig.*, No. 1:20-cv-5646-GHW, 2022 U.S. Dist. LEXIS 34053, at *22-23 (S.D.N.Y. Feb. 25, 2022). Defendants' claim that the FEs lack "insight into the overarching timelines" for development is nonsensical. Mem. at 12. Most of the FEs worked either onshore or offshore and have direct personal knowledge of FLNG-1's development. One of them was the Vice President of Commissioning and Startup for most of the Class Period. ¶45. That title itself shows that FE12 was well-positioned to know about "overarching timelines." And, the delays in commissioning and operations proved that their observations were 100% correct.

Defendants' claim that no FE spoke to the Defendants about project timelines misrepresents factual allegations and will be proved false at trial. Mem. at 13. Edens was part of a WhatsApp chat group, in which he monitored the project's progress in real time. ¶199. Defendants weakly argue that Guinta's instruction to FE11 to delay service contracts does not show actual knowledge, but it certainly demonstrates a full understanding of delay, which is enough to render his statements false when made. *Compare* Mem. at 13 *with* ¶98. In any event, no FE is required to have direct contact with a defendant to plead a viable claim of fraud. *See, e.g.*, *In re Axsome Therapeutics, Inc. Sec. Litig.*, No. 1:22-cv-03925-LGS, 2025 U.S. Dist. LEXIS 61068, at *28-30 (S.D.N.Y. Mar. 31, 2025). Nor is a plaintiff required to find a FE who can describe specific details of conversations and meetings. *See, e.g.*, *Speakes v. Taro Pharm. Indus.*, No. 16-cv-08318 (ALC), 2018 U.S. Dist. LEXIS 163281, at *22-24 (S.D.N.Y. Sep. 24, 2018). Nor can a court simply disregard a FE's recitation of facts merely

11

because a defendant mischaracterizes those facts as an unsubstantiated "difference of opinion." *Compare* Mem. at 14 n.5 *with Forescout Techs., Inc.*, 63 F.4th at 772. Defendants' demand that each FE allegation be precisely communicated to a defendant, Mem. at 14, has no basis in law or fact. Regardless, Defendants here had access to both formal and informal channels of communication that provided them with all the relevant information about FLNG-1's progress, and they publicly held themselves out as extremely knowledgeable about the details. *See infra* at 16-18. Finally, Defendants' bald assertion that the FE accounts are undated and "insufficiently vague" simply ignores detailed Complaint allegations. *See supra* at 7-11.

### 2.   Defendants' Misrepresentations Are Unprotected by the Safe Harbor

Defendants contend that all the challenged statements fall under the safe harbor because some include the word "expectation[s]" and some others refer to projections about EBITDA. Mem. at 10 (citing ¶¶109-72). Not so. Appending "magic words" such as "we expect" "does not itself obviate any potential to mislead investors." *See, e.g., Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 869-70 (W.D. Wash. 2022) (refusing to invoke safe harbor). That some aspect of the statements may relate to a future event is not enough. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 246 (safe harbor does not apply to mixed statements where, as here, the forward-looking statements are "severable" from the non-forward-looking ones).

Defendants disregard numerous well-pled misrepresentations of current fact. *See, e.g.*, ¶109 ("we have developed an efficient and repeatable construction process . . . that substantially reduces the cost and time to build incremental liquification capacity."); ¶114 (same); ¶117 ("Construction of our Fast LNG units is progressing rapidly . . . "); ¶119 (misrepresenting that FLNG-1 was then "rapidly approaching completion."); ¶121 (explicitly stating that misrepresentation was not forward-looking because "it is reflecting the reality of the business more so than projecting kind of some forward results."); ¶128 ("The first one is basically near completion."); ¶132 ("We are nearly done

with #1."); ¶134 (misrepresenting that there is "very little volatility" and "very little [] risk" to get to $2 billion in EBITDA); ¶140 ("Construction of our first Fast LNG is 90%+ Complete . . ."); ¶¶146, 149, 153, 155, 158 (misrepresenting that FLNG-1 was "mechanically" and "materially" complete); ¶160 ("we're in the final stages of commissioning . . . "); ¶167 (same). Having failed to develop arguments about these statements in their motion, Defendants have waived any challenge to their sufficiency. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 n.93 (S.D.N.Y. 2014).

Even the fragments identified above are sufficient to sustain claims for virtually the entire Class Period alleged. To the extent the statements represented that mechanical completion or commissioning of FLNG-1 was on time, on budget and on track, ¶¶112, 114, 119, 121, 130, 140, 149, 160, 162, 165, 169, 171, they suggest both that FLNG-1 was on time, on budget and on track at that time and would continue to be in future. *See In re Akorn Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)); s*ee also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 220 (5th Cir. 2023) (holding that misrepresentations concerning the timelines and progress of a theme park's construction were actionable misrepresentations of fact).

Defendants cannot rely on any purported risk disclosures to shield themselves from liability for any of these statements because they misrepresented the then-current status of construction and omitted then-known shortcuts and problems. Alleged cautionary warnings are irrelevant to current misrepresentations of fact. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010).

While the EBITDA projections Defendants identified may be forward-looking, ¶¶114, 125, 146, 155, 165, NFE failed to provide meaningful cautionary language needed to invoke the safe harbor. All reasonable investors understood that Defendants could not guarantee 100% completion "100% of the time." *Compare Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014)

*with* Mem. at 6-7, 11 (repeatedly referring to boilerplate that Defendants could provide "no assurance" of full commercial operations).[2]  But investors were not told that the cornerstone of the EBITDA figures—timely completion of FLNG-1—was known to be at risk from the start.  *See Meyer*, 761 F.3d at 251.  The EBITDA projections were critical to the Company's long-term success, and the driving force behind its stock price, but they were always based upon the known, false premise that FLNG-1 would deploy on time and increase the Company's earnings.  Defendants knew about delays in real time, *see infra* at 16-18, and understood there was a lot of "volatility" and "risk" in the false EBITDA figures they had provided to the public.  ¶¶134-36.  *See In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) (ruling that knowledge of delays that put launch timeline at risk was sufficient to meet the safe harbor's actual knowledge prong).

The Court has previously refused to extend the safe harbor to false projections under similar circumstances.  *See Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017); *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008).  Defendants' reliance on *Smith v. PureCycle Techs., Inc.* is misplaced.  No. 23-cv-8605 (JGK), 2024 U.S. Dist. LEXIS 232013, at *24 (S.D.N.Y. Dec. 20, 2024).  There were no similar public reports here that would alert an investor to Defendants' decision to ship FLNG-1 offshore before construction was complete or otherwise confirming the cause and severity of delays. *Id.*

### 3.    Defendants Are Liable Even If Opinions Were Expressed

Defendants' attempt to mischaracterize a wide variety of misrepresentations as "opinions" should be rejected.  Many of the statements they reference contain misrepresentations of current fact.

---

[2] The same applies to Defendants' assertion that they were free to make misrepresentations about NFE's declared dividend because dividends were not "guaranteed."  Mem. at 11.

*Compare* Mem. at 16 *with* ¶119 (FLNG-1 "is rapidly approaching completion."); ¶130 (claiming to be "focused on installation, commissioning and operational readiness."); ¶143 (misstating that FLNG-1 is "nearing completion," and the team was then "working to complete as much commissioning as possible"); ¶149 (affirmatively misrepresenting that FLNG-1 is "materially complete," and "each of the rigs have achieved mechanical completion."); ¶155 (misstating that FLNG-1 is "firmly in place," mechanically complete, and "in the final stages of being commissioned."); ¶160 (similar); ¶167 (similar). These misrepresentations are not even qualified with the word "belief," and they cannot be deemed "opinions." *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015) (statements containing embedded misrepresentations of fact are not opinions even if superficially styled as expressions of belief).

Even if some falsehoods arguably contained an expression of belief, Defendants knew about delays and that the EBITDA figures were at risk, *see infra* at 15-16, made numerous misrepresentations of embedded fact, *see supra* at 7-14, and their misrepresentations never fairly aligned with the material information Defendants possessed but chose to omit, *id.* That is sufficient to impose liability. *See Omnicare*, 575 U.S. at 184-86. The claim that no FE provides information that contradicts Defendants' false statements about construction and commissioning contradicts the Complaint. Mem. at 16. Nor does any purported warning or cautionary statement come remotely close to apprising investors of the omitted, material risks, *id. See supra* at 7-14.

### 4. Defendants' Misrepresentations Went Well Beyond Corporate Optimism

Isolating a few progress statements out of context, Defendants raise a flimsy puffery argument. Mem. at 17. Dismissal of the exact same fragments that Defendants emphasize here was recently reversed. *See Six Flags*, 58 F.4th at 220 (holding that misrepresentations concerning the timelines and "progress" of a theme park's construction were not puffery). Courts in this Circuit have also declined to find that such statements are puffery, especially where, like here, they were made in

15

direct response to specific questions posed by analysts. *See, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 221-23 (S.D.N.Y. 2022). Negative commentary from analysts following disclosure of repeated delays demonstrates that Defendants' statements were material and important to investors. *Compare* ¶¶176-90 *with See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("The sharp criticism from industry analysts after Scholastic's February 20 press release further indicates the weight given to information pertaining to Goosebumps sales and returns."). Even if any fragment could be assumed as puffery, Defendants remain liable because they knew that FLNG-1 was not progressing as publicly represented and that the published EBITDA figures were at risk. *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 173-74 (2d Cir. 2020) ("We have found puffery . . . actionable only when the speaker knew that the contrary was true"); *see also infra* at 16-18.

## B. A Strong Inference of Scienter is Alleged

### 1. Actual Knowledge of Facts That Rendered Defendants' Statements Misleading

Defendants' access to, and actual knowledge of, the concealed information that contradicted their public misrepresentations is alone sufficient to plead scienter. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76. FEs explained that: (a) Edens and Guinta were both very hands on and deeply concerned about delays at FLNG-1, (b) both had daily calls concerning the progress of FLNG-1, (c) Edens was in a WhatsApp group chat where he demanded daily and even hourly updates that bypassed traditional chains of command, (d) Edens frequently visited the FLNG-1 site, (e) Edens and Guinta participated in meetings with leadership overseeing FLNG-1, and (f) both attended meetings where financial projections were discussed. ¶¶197-203, 206.

Additionally, Defendants' own statements demonstrate that they were knowledgeable about FLNG-1's construction status. *See, e.g.*, ¶¶121, 128, 130, 134, 137, 140, 143, 149, 155, 160, 162, 205, 207, 218-20. As in *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326–27 (S.D.N.Y. 2018), Defendants were "regularly quoted on behalf of" the company discussing the

misrepresented issues. *See also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809, at \*47 (S.D.N.Y. Nov. 26, 2018) ("Having represented that they were actively monitoring Signet's credit portfolio on an ongoing basis, Defendants had a duty to discharge that function so as not to render their earlier representations misleading."). Guinta's correspondence with the SEC regarding the status of FLNG-1, and his decision to purposefully delay efforts to sign service and repair contracts due to uncertainty surrounding when operations could begin on FLNG-1 further support scienter. ¶¶98, 206, 217-20.

Similar allegations have been sustained in this District. In *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 242-46, scienter was sufficiently pled because defendants: (1) received information from former employees and contractors about the true status of overruns and delays, (2) received reports detailing delays and cost overruns at the site, (3) directed a subordinate to stop looking into delays and cost overruns at the site, and (4) visited the site on multiple occasions where "knowledge of delays and cost overruns" "were no secret." Similarly, in *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289-92 (S.D.N.Y. 2020), the court found that defendants received information from former employees and contractors regarding cost overruns and potential project delays sufficient to establish that defendants had access to information contradicting their public statements about the supposedly on-track and on-budget project. Like the plaintiffs in *Turquoise Hill* and *Sasol*, Plaintiffs here have sufficiently alleged knowledge of information contradicting public statements to establish a strong inference of scienter.

None of Defendants' arguments weigh in favor of dismissal. While Defendants concede that at least three FEs interacted with the Individual Defendants, their insistence that other FEs must do the same is incorrect. Mem. at 19. The Second Circuit has repeatedly reversed dismissals based on FE accounts from FEs who had no interaction with a defendant. *See, e.g.*, *Blanford*, 794 F.3d at 307-08; *In re Synchrony*, 988 F.3d at 169-70. There is also no reason to require a plaintiff to produce a

smoking gun document that contradicts a defendant's misrepresentations or plead information about meetings with the exactitude Defendants demand. *Compare* Mem. at 19-20 *with Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 323 (S.D.N.Y. 2024) (scienter found based on allegations of reports rendering public statements misleading); *see also BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 326 (S.D.N.Y. 2016) (access to progress reports contradicting public statements); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2018 U.S. Dist. LEXIS 87991, at *29-31 (S.D.N.Y. May 24, 2018) (similar).

Defendants are mistaken when arguing that Guinta's instruction to postpone service contracts does not contradict public misrepresentations. Mem. at 20. That allegation shows Guinta's actual knowledge of concealed delays and hurdles to FLNG-1's completion. ¶206. Defendants' reliance on *Lau v. Opera Ltd.* is misplaced. 527 F. Supp. 3d 537, 557 (S.D.N.Y. 2021). There, the plaintiffs failed to explain how "the defendants deliberately attempted to mislead investors by referring them to the very sources that would allegedly disclose the misleading nature of the statements." *Id.* Defendants here **did *not*** direct investors to information showing that the FLNG-1's construction was woefully behind schedule and plagued with problems, and in fact the Complaint shows Defendants did the opposite. *See, e.g.*, ¶¶61, 75 (Investor Day tour); ¶¶79-83 (premature launch of FLNG-1 designed to deflect concerns of delay).

Plaintiffs do not merely rely on Defendants' executive positions, Mem. at 20, but instead allege that they actually attended meetings, received reports, participated in specific group chats, and made public representations admitting specific knowledge of FLNG-1's construction status. This is enough to plead scienter at this preliminary stage.

## 2. FLNG-1 Was NFE's Core Operation

"Core operations include matters critical to the long term viability of the company and events affecting a significant source of income." *In re Avon Sec. Litig.*, No. 19 Civ. 01420 (CM), 2019 U.S.

Dist. LEXIS 200816, at *61 (S.D.N.Y. Nov. 18, 2019). Contrary to Defendants' claim, the doctrine does not require the operation to constitute "nearly all of the Company's business" to be invoked. Mem. at 20. *See In re Avon Sec. Litig.*, 2019 U.S. Dist. LEXIS 200816, at *61 (noting that courts in this District have applied it even if the issue impacts 18%-20% of revenues).

Defendants told investors that FLNG-1 on its own would drive NFE's potential EBITDA from breakeven to $2.5 billion. ¶¶61-62. Edens further admitted that even a 2- or 3-month delay in FLNG-1's completion could harm NFE. ¶193. Regulatory hurdles that slowed the Company's other FLNG projects during the Class Period only increased FLNG-1's central importance to NFE's ability to drive earnings and growth. ¶¶194-96. These reasons are sufficient to invoke the core operations doctrine.

### 3. Motive, Though Not Required, is Alleged

Edens financed a large dividend payment just as he started to mislead investors about the FLNG-1 project, personally receiving a cash payment of $217 million. ¶¶210-15. Courts recognize that dividend payments can be indicative of scienter. *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 607 (W.D. Tex. 2014). Contrary to Defendants' assumptions, Mem. at 18-19, Edens's status as the largest shareholder of NFE weighs ***in favor*** of scienter given his ability to control the amount of the dividend and reap a disproportionate share of the proceeds. *See Stone*, 26 F. Supp. 3d at 607 (ruling that defendant's ability to declare a dividend and benefit disproportionately from it weighed in favor of scienter). That Edens retained most of his holdings does not undermine scienter because he received them virtually for free. *Compare* Mem. at 18-19 *with Stadium Capital LLC v. Co-Diagnostics, Inc.*, No. 22-cv-6978 (AS), 2024 U.S. Dist. LEXIS 19754, at *23 (S.D.N.Y. Feb. 5, 2024) (ruling that the vesting of restricted stock units or shares "for free" cannot undermine scienter). Stock sales are also irrelevant when Edens received a windfall of approximately $217 million through the unusual dividend policy. Mem. at 18-19. At any rate, Defendants do not contest that the massive, never-

before $217 million payout was unusual in both magnitude and timing.

### 4.  Defendants Present No Competing Inference

Nothing Defendants speculate about has any relevance.  This case is not about the mere failure to meet projections.  Mem. at 21-22.  All investors know that forecasts can be "uncertain," but Defendants' misrepresentations concealed serious, known risks that delayed FLNG-1, for which no excuse is offered except denial.  *Id.*  There is also no evidence that FLNG-1 was "successfully completed."  *Id.*  It was prematurely shipped offshore, and FEs confirm that commissioning remained incomplete in July 2024.  ¶105.

### C.    The Complaint Sufficiently Alleges Loss Causation

Plaintiffs' loss causation allegations easily satisfy Rule 8.  *In re Estée Lauder Co., Inc. Sec. Litig.*, No. 23-cv-10669 (AS), 2025 U.S. Dist. LEXIS 61337, at *34 (S.D.N.Y. Mar. 31, 2025) (noting that this element is subject to the liberal notice pleading standard).  The Complaint adequately pleads both partial disclosures of the truth and materialization of the risks Defendants concealed.  ¶¶173-90. Each corrective disclosure revealed delays in the completion date for FLNG-1, poor financial results and downward revisions in earnings targets.  These disclosures directly contradicted Defendants' false statements concerning timing and completion as well as the Company's EBITDA figures.  Negative analyst coverage that focused on these issues only reinforces Plaintiffs' loss causation theory. *Compare* ¶¶ 176, 179, 182-87 *with Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021).

Defendants' contention that material risks were sufficiently disclosed by their boilerplate and misleading risk statements simply repackages the assertion that generic warnings can somehow immunize omission of actual, specific, and already materializing risks.  *See supra* at 7-16.  It has nothing to do with loss causation.  Ignoring that the price of NFE's common stock declined from $35.15 on February 29, 2024 to $34.43 on March 1, 2024 and further declined to $32.02 on March 4,

2024, ¶¶ 175, 178, Defendants ask the Court to dismiss because the decline did not occur immediately, Mem. at 22.  Stock prices do not always decline immediately upon the announcement of a corrective disclosure, and relevant news can be absorbed by an efficient market a day later as it was here.  *See e.g.*, *Liberty Media Corp., LMC v. Vivendi Universal*, S.A., 923 F. Supp. 2d 511, 522 (S.D.N.Y. 2013).  Regardless, this is not a pleading issue, and Defendants will have the opportunity to present evidence on causation after discovery.  *See, e.g.*, *In re VimpelCom, Ltd.*, No. 1:15-cv-8672 (ALC), 2016 U.S. Dist. LEXIS 135050, at *8 (S.D.N.Y. Sep. 26, 2016).

Defendants' argument that no negative news was released in July 2024 and August 2024 defies the record.  On July 23, 2024, the Company announced another delay for FLNG-1, which caused the price of its stock to decline by nearly 20% over the next three trading days.  ¶¶180-81.  On August 9, 2024, the Company conceded that the cost of delays was $150 million and announced that NFE missed its Adjusted EBITDA goal by over 56%, resulting in a 23% decline in the Company's stock price.  ¶¶182-87.  These events can properly serve as corrective disclosures.  *San Antonio Fire & Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 324 (S.D.N.Y. 2024) (finding that loss causation was sufficiently pled based on disappointing sales and lowered guidance).  That the stock price declines here exceeded 20% only makes Plaintiffs' theory more plausible.  *See In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 U.S. Dist. LEXIS 61337, at *35-36.

**D.    The Complaint Adequately Alleges Violations of §20(a) of the Exchange Act**

Because the Complaint sufficiently pleads claims under Section 10(b) of the Exchange Act, the control person claims should be sustained.  *See, e.g.*, *id.* at *36.

**V.    <u>CONCLUSION</u>**

For these reasons, Defendants' motion should be denied in full.  Should the Court find the Complaint wanting in any respect, Plaintiffs respectfully request leave to replead.

Dated:  May 19, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**


*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*


-and-

**POMERANTZ LLP**

Omar Jafri (admitted *pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
ojafri@pomlaw.com

*Attorneys for Additional Plaintiff and*
*Additional Counsel for the Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Civil Rule 7.1, I hereby certify that this document complies with the word limit and formatting rules established by the Court's Individual Practices dated March 17, 2025, and contains 6,945 words, exclusive of the cover page, table of contents, table of authorities, certificates of compliance and service, and signature block.

Dated: May 19, 2025                              */s/ Adam M. Apton*
                                                 Adam M. Apton